876 F.2d 448
 54 Ed. Law Rep. 126
 Mrs. Cloerine BREWER, Tae Chin Gilmore and Humberto Flores,
Plaintiffs-Appellants, Cross-Appellees,
v.
Dr. Clarence HAM, Superintendent of the Killeen Independent
School District, Kay Young, Gordon Adams, Wendell Kearney,
Charles P. Gilbert, Jimmie Don Aycock, Earl E. Burton, and
Jim Ray, Trustees of Killeen Independent School District,
Defendants-Appellees, Cross-Appellants.
 No. 88-1401.
 United States Court of Appeals,
Fifth Circuit.
 June 30, 1989.
 
 Mark Burnette, John W. Walker, Little Rock, Ark., for plaintiffs-appellants, cross-appellees.
 Eric W. Schulze, Judith C. Underwood, Austin, Tex., for defendants-appellees, cross-appellants.
 Appeals from the United States District Court for the Western District of Texas.
 Before GARWOOD, JONES and SMITH, Circuit Judges.
 EDITH H. JONES, Circuit Judge.
 
 
 1
 Cloerine Brewer, Tae Chin Gilmore and Humberto Flores appeal the district court's denial of their application for a declaratory judgment and injunction against the Killeen Independent School District's (KISD) continued use of an at-large election system for choosing school board members. The appellants claim that the current election system violates Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Sec. 1973 (1982). Applying the analysis set forth by the Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the district court found that the appellants had failed to demonstrate that the proffered minority group (black, Hispanic, and Asian citizens) was sufficiently large and geographically compact to constitute a majority in a single-member district. The district court also rejected the appellants' contention as to the political cohesiveness of the combined minority group. For the reasons set forth below, we AFFIRM.
 
 FACTS
 
 2
 Under the present at-large system, each school board (Board) member (known as a trustee) is elected by a plurality of the votes cast. Candidates are slated at each of seven trustee positions (seats). Although seven non-white candidates have run for the Board since 1978, no non-white has been elected.
 
 
 3
 After unsuccessfully seeking a trustee position in April 1986, appellant Brewer, along with other black citizens in Killeen, met with the Board to express their dissatisfaction with the current election system. The Board appointed three of its members to study the problem.
 
 
 4
 At the request of this committee, two Baylor Law School professors, David Guinn and Michael Morrison, began a three-phased study. In the first phase, the professors were to determine whether the KISD could be divided to create a majority minority population in at least one single-member district. If the Board decided to adopt such a plan, the professors were to proceed to the second phase and evaluate whether the current KISD election system violated Section 2 of the Voting Rights Act (the Act). The third phase of the project was to prepare a districting plan to be submitted in accordance with Section 5 of the Act. Two types of proposed districting were examined: a 5-2 arrangement and a 7-0 arrangement.[1] After completing the first phase,[2] Dr. Aycock, the committee chairman, asked the professors to skip Phase Two of the project and proceed to Phase Three. Shortly thereafter the Board, at the recommendation of the committee, elected to halt the project.
 
 
 5
 Subsequently, the appellants sued to challenge the current election scheme. The district court found that voting in the KISD elections was racially polarized "at least to some extent." The district court also found that the evidence established a pre-1954 history of official racial discrimination in the KISD, the effects of which linger to date. Under the present at-large, numbered place system, the district court found that the political majority could control every position on the Board. The district court also found that the white majority voted sufficiently as a bloc to enable it usually to defeat a minority's preferred candidate. The court also found that there was no candidate slating process to which non-white candidates have been denied access and no evidence of overt or subtle racial appeals in campaigns for the Board.
 
 
 6
 The district court found, however, that the appellants failed to meet their burden of proof on two of the three elements of the threshold analysis established in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Not only were appellants unable to propose a districting scheme that would necessarily contain a combined minority (black, Hispanic & Asian) voting age majority, but they also failed to establish political cohesion among the three minority groups.
 
 
 7
 All parties agree that no district can be drawn to establish a majority minority voting age population composed only of black citizens. The appellants contend, however, that they proposed a 7-0 plan which would contain an estimated 59.91% total combined minority population (black, Hispanic and Asian). They further contend that their failure to provide population figures based on voting age should not result in a denial of relief. The appellants disagree with the district court's finding on inter-minority cohesion. Alternatively, the appellants claim that the Thornburg v. Gingles threshold analysis is inapplicable to at-large systems which require only a plurality--not majority--of the vote.
 
 DISCUSSION
 
 8
 We are called upon to address more questions raised by Congress's 1982 amendment to Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973,[3] as the Supreme Court interpreted it in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Cognizant of the inherent tensions between Congress's assurance of equal opportunity for minority participation in the electoral process by employing an "effects test" of exclusion, and Congress's rejection of mandatory proportional representation, we take some comfort in the necessity for a searching and practical inquiry into the facts by the district courts. Overton v. City of Austin, 871 F.2d 529 (5th Cir.1989). In reviewing the district court's findings regarding a Section 2 claim--whether pertaining to the Thornburg threshold analysis or the totality of the circumstances inquiry--we apply the clearly erroneous standard. Overton v. City of Austin, 871 F.2d at 533. See also Thornburg, 478 U.S. at 79, 106 S.Ct. at 2781.
 
 
 9
 The boundaries of our legal analysis are defined by Thornburg and by the seven-factor Zimmer test for discriminatory electoral procedures drawn originally from our court's decision in Zimmer v. McKeithen[4] and later adopted by Congress and the Supreme Court. In Thornburg, the Court re-endorsed the Zimmer factors, but also concluded that:
 
 
 10
 While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.
 
 
 11
 Thornburg, 478 U.S. at 47-50, 106 S.Ct. at 2765-66. The three elements essential to this threshold finding are: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed--usually to defeat the minority's preferred candidate. See id. 478 U.S. at 50-52, 106 S.Ct. at 2766-67. Appellants' failure to establish any one of these three elements of the Thornburg test is fatal to their claim. Thornburg, 478 U.S. 30, 48-51, 106 S.Ct. 2752, 2765-67. See also Overton v. City of Austin, 871 F.2d 529.
 
 
 12
 A. Size and Geographical Compactness of the Minority Group
 
 
 13
 The district court found that the appellants had failed to propose a single-member district within the KISD that would contain a majority of the voting age population of a minority group including blacks, Hispanics, and Asians. According to the district court, the most favorable plan presented contained one district with a total minority population of 55.91%.
 
 
 14
 The court observed that Dr. Morrison, co-director of the unfinished KISD study, testified that it was possible that in such a district, the percentage of minority voting age population could drop below the 50% level. The district court went on to say,
 
 
 15
 [E]ven considering the Plaintiffs' demographic evidence in its most favorable light, the most that can be concluded is that the evidence is inconclusive.... The most they have shown is that perhaps there is a slim minority majority district in one proposed plan.... It is impossible to know the exact effect of using voting age population data; however, clearing up this uncertainty was the Plaintiffs' burden which they failed to carry.
 
 
 16
 Appellants urge this court to adopt a rule of thumb to be used in the absence of special circumstances, which in effect, would have the court assume that the minority voting age population percentage differs from the minority total population percentage by five percent. To support their position, appellants cite Ketchum v. Byrne, 740 F.2d 1398, 1415 (7th Cir.1984).
 
 
 17
 We decline the appellants' invitation for several reasons. First, the appellants mistakenly characterize Ketchum v. Byrne as establishing a five percent rule of thumb for estimating voting age from total population figures. Ketchum, a pre-Thornburg decision, was addressing the remedial phase of a challenge brought against a redistricting plan. The Seventh Circuit expressed uneasiness with any single corrective formula, noting that in the districts it was examining, "discrepancy between total population and voting age population for minority groups ... is often greater than the 5% commonly employed to compensate for the disparity." Ketchum, 740 F.2d at 1413.
 
 
 18
 Second, our court has refrained from endorsing any uniform method for deriving voting age figures from general population data. The appropriate method and its results in a given case are matters of fact which the plaintiffs must prove. Of course, where the minority population in a proposed single-member district is sufficiently large, district courts may rely on such figures as evidence that the minority's voting age population exceeds 50%. For example, in two previous cases before our court where the newly-created single-member districts contained a minority population well in excess of 60%, the district court could reasonably conclude that the voting age population exceeded 50% as well. See Campos v. City of Baytown, 840 F.2d 1240 (5th Cir.1988) (proposed districts containing 72.3%, 75.4%, 76.9% and 65.9% total minority population); League of United Latin American Citizens v. Midland Independent School District, 812 F.2d 1494 (roughly between 71.5% and 78% total minority population in proposed minority districts), vacated en banc 829 F.2d 546 (5th Cir.1987).
 
 
 19
 The need for voting age population data, as opposed to total population data, in making the Thornburg analysis should be obvious.
 
 
 20
 The raison d'etre of Thornburg and of amended Sec. 2 is to facilitate participation by minorities in our political processes, by preventing dilution of their votes. Only voting age persons can vote. It would be a Pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not in voting age numbers, continued to be defeated at the polls. Thornburg implicitly recognized this fact: "Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that practice." 478 U.S. at 50-51 n. 17, 106 S.Ct. at 2766-67 n. 17 (emphasis added).
 
 
 21
 Overton, 871 F.2d at 542 (Jones, J., concurring). The appellants had the burden to prove the existence of a single-member district in which they could elect candidates of their choice. Based on the paucity of evidence before the district court as to voting age population, we cannot overturn the district court's finding as clearly erroneous.
 
 
 22
 Appellants also argue that the district court overlooked evidence establishing the feasibility of a plan containing a 59.96% total minority population. The district court's findings as to the districting plan producing the greatest concentration of minorities are factual findings protected by the clearly erroneous rule. The record is equivocal as to whether such a district was ever considered to be a feasible alternative. As such, the district court's finding that the most favorable district to appellants contained a total minority population of 55.91% is not clearly erroneous. We need not explore the record concerning an alternative district, however, because we agree with the district court that the evidence fails to establish political cohesion among the three minority groups. This failure is dispositive of their challenge under the Thornburg threshold analysis.
 
 
 23
 B. Political Cohesion Among the Minority Groups
 
 
 24
 In Campos, our Circuit held that minority groups may be aggregated for purposes of asserting a Section 2 violation.[5] We noted, however, that
 
 
 25
 if one part of the [combined minority] group cannot be expected to vote with the other part, the combination is not cohesive. If the evidence were to show that the Blacks vote against a Hispanic candidate, or vice versa, then the minority group could not be said to be cohesive.
 
 
 26
 Campos, 840 F.2d at 1245.
 
 
 27
 Our recent opinion in Overton v. City of Austin cautions against reaching conclusions about inter-minority cohesion absent a diligent inquiry into the political dynamics of the particular community. For example, the district court found that in Austin elections between 1975 and 1983, in four out of nine races in which blacks and Hispanics supported candidates different from those supported by whites, the black-supported candidate did not receive a majority of the Mexican-American vote and the Mexican-American-supported candidate did not receive a majority of the black vote. Overton, 871 F.2d at 536.
 
 
 28
 As the district court recognized in this case, the determinative question is whether black-supported candidates receive a majority of the Hispanic and Asian vote; whether Hispanic-supported candidates receive a majority of the black and Asian vote; and whether Asian-supported candidates receive a majority of the black and Hispanic vote in most instances in the KISD area. See Campos, 840 F.2d at 1244-45 (the most persuasive evidence of inter-minority political cohesion for Section 2 purposes is to be found in voting patterns ). Accord Thornburg, 106 S.Ct. at 2769. The results from bivariate ecological regression analysis of five races in the challenged system (city council) convinced the court in Campos that blacks and Hispanics were politically cohesive.
 
 
 29
 Appellants here presented no statistical evidence to support their claim. They contend, however, that lack of statistical evidence of inter-minority political cohesion should not be fatal if other evidence demonstrates cohesion. Thornburg does suggest that other evidence may be sufficiently probative. Thornburg, 106 S.Ct. at 2769-70 ("a showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim"). Nevertheless, the record before us supports the district court's finding that the appellants failed to establish political cohesion.
 
 
 30
 No Asian-American has yet run for the KISD, and only one Spanish-surnamed candidate has done so. As the district court found, the only evidence of cohesion among racial minorities consisted of the testimony of two members of the KISD black community plus the testimony of appellants Brewer, Flores, and Gilmore that "efforts" were being made to form non-white minority political coalitions.
 
 
 31
 An equal or greater number of witnesses testified that they saw no signs of political cohesion among these groups. Fannie Flood, campaign manager for appellant Brewer, testified that she could not recall any Hispanics or Asians having worked on the Brewer campaign and was unaware of any joint efforts by combined minority organizations or groups to support Brewer in the election. Flood also testified that she was unaware of any coalitions of blacks, Hispanics and Asians having united behind any candidate in the KISD area. Rev. M.C. Cooper, then president of the local chapter of the NAACP, was unable to identify any Hispanic or Asian community organization or any of their leaders. Additionally, Brewer testified that she was unaware of any effort by the black community to assist in the campaign of Mr. Acosta, the only Hispanic candidate to seek election.[6] Neither Humberto Flores nor Tae Chin Gilmore, named plaintiffs in this suit, testified to any personal participation in campaigns for minority candidates.
 
 
 32
 Appellees also presented testimony from their expert Dr. Olson. According to Dr. Olson, his multivariate regression analysis showed that blacks and Hispanics were "in direct opposition in most [KISD] elections" in which minority candidates ran. Appellants offered no witnesses to rebut this conclusion.
 
 
 33
 Appellants assert that their challenge is not to the district court's factual findings, but rather to the trial court's erroneous legal requirement that statistical evidence be a prerequisite to a finding of inter-minority political cohesion. The district court's opinion belies this contention:
 
 
 34
 [F]or the Court to make a finding of minority group political cohesiveness here requires some sort of information, statistical or otherwise, that Blacks, Hispanics, and Asians usually vote together or usually vote for the same candidate.... These ... groups must be shown to vote together by some sort of reliable evidence for this Court to be able to make a finding of political cohesiveness.
 
 
 35
 (emphasis added).
 
 
 36
 As Overton demonstrates, courts should not hastily assume that cooperation among minority groups in filing a Section 2 complaint will inevitably lead to a finding of political cohesion in their actual electoral practices. While appellants correctly note that statistical evidence is not a sine qua non to establishing cohesion, they must still satisfy their burden of proof under Section 2 and Thornburg. The district court's finding that the appellants were unable to do so in this case is not clearly erroneous.
 
 
 37
 C. Does the Thornburg Threshold Analysis Apply to At-Large Plurality Systems?
 
 
 38
 Appellants' alternative argument attacks the applicability of the first element of the Thornburg analysis to at-large plurality electoral systems such as that of the KISD. Since less than a majority of the vote can, in some instances, elect a candidate to the KISD Board, appellants urge this Court to adopt a threshold requirement for minority voting strength that does not inalterably demand the creation of a single-member district containing a majority minority voting age population. Specifically, they ask us to deem adequate their redistricting proposals insofar as they would create districts in which blacks, alone, could theoretically prevail in a multicandidate plurality race.[7] We decline to do so.
 
 
 39
 Neither Section 2 nor the Zimmer factors attach specific significance to the existence of a plurality or majority vote requirement. A plurality feature is of course more responsive to minority voter groups. United States v. Marengo County Comm., 731 F.2d 1546, 1565 n. 31 (11th Cir.1984). In this case, the minority population is so geographically dispersed around Killeen that its members cannot constitute a majority in a hypothetical single-member district.[8] It would seem ironic then, to lower the threshold for determining actionable racial vote dilution to account for a minority-favoring electoral device in a less-segregated city.
 
 
 40
 The essence of the appellants' Section 2 claim is that the use of the current at-large election system impermissibly dilutes the voting strength of minorities within the KISD. At-large election systems, however, are not per se violative of Section 2. S.Rep.No. 417, supra, 1982 U.S.Code Cong. and Admin.News at 212; Thornburg, 478 U.S. at 46, 106 S.Ct. at 2764. Although Thornburg does not expressly address the relative legal impact of a plurality versus a majority vote requirement, its analysis seems equally applicable to the instant case. Thornburg teaches us to focus on whether, "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice." Thornburg, 478 U.S. at 44, 106 S.Ct. at 2763 (quoting S.Rep.No. 417, 1982 U.S.Code Cong. and Admin.News 177) (emphasis added). Courts must therefore measure the alleged discriminatory election system against an ideal electoral system which does not contain the challenged structure. See Thornburg, 478 U.S. at 88, 106 S.Ct. at 2786 (O'Connor, J., concurring) (vote dilution claims require courts to determine "how hard it 'should' be for minority voters to elect their preferred candidates under an acceptable system"). If the minority group is dispersed throughout the electoral district or is so small in proportion to the electorate as a whole, such that even under a single-member districting plan the minority is not assured the power to elect representatives of its choice, the at-large feature of the election system, by itself, cannot be said to violate Section 2. Thornburg, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766-67 n. 17. In other words, as the Court held in Thornburg, "unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." Id. See also Campos, 840 F.2d at 1244.
 
 
 41
 Appellants' argument fails to explain how they have a "potential to elect" representatives of their choice when they support districts where minority voters could theoretically capture a KISD seat in a multi-candidate election but would have no functional majority in a two-candidate contest. Such a tenuous connection between the means and ends sought by appellants raises a cautionary signal to courts asked to intervene in the self-governance of a local political unit.
 
 
 42
 Appellants' argument also founders on the electoral history of the KISD. They note that since 1973, nine out of thirty-two candidates to the Board have been elected by a mere plurality of votes cast. Theoretically, a three-candidate race could be won with only 33.34% of the vote; likewise, a four-candidate race could be won with only 25.01%. Appellants' data do not suggest either that multicandidate races are typical in the KISD or that they could be expected to persist if single-member districts are created. The appellants' predictions, based on election histories, as to the likely number of candidates to run for any seat are not supportive of their case for plurality-minority districts.[9] Appellants forget that the number of votes necessary to win in any four-candidate race will vary according to the voter appeal of the individual candidates. Where the candidates are extremely competitive in voter appeal, 27% of the votes might win the race; however, if only two candidates are serious contenders, a figure approaching 50% will be required. Courts do not adjudicate with crystal balls. The appellants' specific challenge to the at-large feature of the KISD's election system necessarily asks us to compare the effects (i.e. the electoral results) of the present system with the predicted effects of an alternative single-member district plan, but their evidence demonstrates no basis for finding that anything less than a district including a majority of minority voters would yield them the effective participation in KISD board elections contemplated by the first prong of Thornburg.[10] The only other circuit court to consider whether to apply a "flexible" approach to the first element of the Thornburg threshold analysis when examining a plurality at-large system has also rejected the proposal. McNeil v. Springfield Park District, 851 F.2d 937 (7th Cir.1988).
 
 
 43
 There is only speculative merit but nearly certain mischief possible from creating single-member districts simply to ensure a plurality election possibility for a minority group. Neither the law nor the facts requires further consideration of such an approach to the first element of the Thornburg analysis.
 
 
 44
 Because appellants have not proved a Sec. 2 violation, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Under a 5-2 plan, five trustees would be elected from single-member districts and two additional trustees would be elected at-large. A 7-0 plan requires all trustees to be elected from single-member districts
 
 
 [2]
 At the completion of the first phase, Guinn and Morrison had developed some tentative districting plans
 
 
 [3]
 Amended Section 2 of the Voting Rights Act provides:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 (b) a violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. Sec. 1973 (1982).
 
 
 [4]
 485 F.2d 1297 (5th Cir.1973) (en banc) aff'd sub nom. on other grounds, East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). Those factors are:
 
 
 [1]
 the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 [2]
 the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 [3]
 the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 [4]
 if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 [5]
 the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 [6]
 whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 [7]
 the extent to which members of the minority group have been elected to public office in the jurisdiction
 Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
 (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.
 S.Rep.No. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. and Admin. News 177 at 206-07.
 
 
 [5]
 The author of this opinion dissented from the denial of rehearing en banc of Campos, 849 F.2d 943 (5th Cir.1988)
 
 
 [6]
 Acosta did not carry any precinct in his election bid, consequently, appellants contend that the lack of support for Acosta among the minority groups is irrelevant, because he was not the preferred candidate of either the black, Asian, or Hispanic minority groups. Although this evidence may be of little probative value, it is not irrelevant and thus may be weighed with other evidence before the district court
 
 
 [7]
 Appellants in this part somewhat mysteriously abandon their reliance on a multiracial, politically cohesive minority group
 
 
 [8]
 The district court found that KISD is "very unique ... because its minority citizens seem to be spread throughout the district to a much larger--larger extent than we normally see in Texas."
 
 
 [9]
 The district court found that the 5-2 plan yielding a combined minority population of 55.91% in one district was the most favorable to the appellants. The minority district contained a total black population of 35.77%. Since 1973, only three contested elections in the KISD have been won with less than 40% of the vote. None has been won with less than 36%. Therefore even judging by past KISD elections, appellants have not established that a district could be created which is likely to provide the black minority with the potential to elect its candidate. Consequently, even if we were to adopt a modified version of the first Thornburg threshold element, we could not say, with any degree of confidence, that the black minority would be able to constitute a successful plurality based on past electoral history in the KISD
 
 
 [10]
 It is possible to conceive a case in which a factual predicate might exist for creating a non-numerically predominant voting age minority population district within a plurality electoral system. This might occur if a proposed single-member district had a population consisting of whites and two non-cohesive minority groups, such as blacks and Hispanics. If it was shown to be likely that each group would field candidates and if the other criteria for Sec. 2 relief were met, a population mix such as 40% blacks, 35% whites and 25% Hispanics might arguably satisfy Thornburgs' first prong, despite our general rejection of such a possibility in the test above. This hypothesized situation would pose additional problems under Thornburg, however, for that decision does not deal with a polity of more than two disparate voting groups (blacks and whites) nor with the Sec. 2 implications for Hispanic voters of creating the hypothesized district