Reverend G. Edward WEST; Reverend A.M. Smith; Reverend U.C. Washington; Reverend Gary Hinkle; Reverend Timothy Neal; Reverend B.U. Smith; and Reverend Alex Bray, Plaintiffs,

v.

Bill CLINTON, Governor of the State of Arkansas; William J. "Bill" McCuen, Secretary of State; Winston Bryant, Attorney General; Arkansas Board of Apportionment; Clifford H. Jeffords; James O. Cox; Eldon F. Coffman; and Sebastian County Board of Election Commissioners, Defendants.

No. 91–2237.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

March 12, 1992.

Charles Karr, Fort Smith, Ark., for plaintiffs.

Tim Humphries, Little Rock, Ark., for defendants.

Before RICHARD SHEPPARD ARNOLD, Chief Circuit Judge, H. FRANKLIN WATERS, Chief District Judge, and MORRIS SHEPPARD ARNOLD, District Judge.

RICHARD SHEPPARD ARNOLD, Chief Circuit Judge.

This is a suit under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 *et seq.*, challenging the multimember district for state representatives in a portion of Sebastian County, Arkansas.[1] Voters in the district in question elect three members of the House of Representatives of the Arkansas General Assembly. The essential theory of the complaint is that this multimember arrangement submerges minority voters, making it impossible, or at any rate more difficult, for them to influence elections.

The complaint asks us to order the defendants, who are state and county election officials, to redraw the district, dividing it into three single-member districts. One of these districts, it is alleged, could have a minority population of a little more than twenty-nine per cent.

Defendants have filed a motion to dismiss or for summary judgment. Attached to the motion are certain materials outside the pleadings, including the transcript of a hearing held by the State Board of Apportionment on the question of how to draw the district lines in the area of the state in question, and a number of letters and other expressions of opinion on the relative merits of a multimember district versus three single-member districts. Plaintiffs have filed a response to the motion, opposing it, but have not accompanied their response with any exhibits, affidavits, or other materials outside the pleadings. There has been no discovery, nor has either side attempted any. We have heard oral argument on the motion. On the basis of the argument, the pleadings, and our study of the law, we now grant defendants' motion for summary judgment and dismiss the suit with prejudice. A judgment to this effect is being entered simultaneously with the filing of this opinion.

■ The motion before us, as noted, is in the alternative: it is a motion to dismiss or for summary judgment. We assume for present purposes that the complaint states a claim, and we therefore do not further discuss the motion to dismiss as such. Instead, we address the case in the context of a request for summary judgment. Not only is the motion so captioned, but, in addition, it would have to be treated as a motion for summary judgment even if it were captioned only as a motion to dismiss, because the moving party has attached to the motion materials outside the pleadings, and these materials have not been excluded by the Court. Fed.R.Civ.P. 12(b). (Indeed, plaintiffs have not asked us to exclude any

---

1. The complaint pleaded claims under the Fourteenth and Fifteenth Amendments, as well as under the Voting Rights Act, but the constitutional claims have been abandoned. Counsel for plaintiffs so stated on the record at the oral argument on the motion for summary judgment.

of the materials submitted by defendants along with their motion.) In this procedural posture, our task is clear. We are to determine whether there is any genuine issue of material fact and, if there is none, whether defendants are entitled to judgment as a matter of law.

The Supreme Court has recently made clear the procedure and standards to be followed in ruling on motions for summary judgment. Such motions are not a substitute for trial. If there is any genuine issue of material fact, the case cannot be disposed of without trial, and this is true even when the trial would not be before a jury, but to the court, as is the case here. The right to a trial is a precious one, and cases should not be decided on pleadings or other papers unless the entitlement to judgment as a matter of law is clear. On the other hand, once a motion for summary judgment has been filed, asserting the absence of any facts that would warrant the granting of relief under the relevant legal standards, the burden of coming forward with something to defeat the motion shifts to the opposing party. He must file an opposition to the motion and point to something in the record, whether pre-existing or filed along with the opposition, that would create a genuine issue of material fact. If the opposing party fails to do this, the motion for summary judgment must be granted. See, *e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "); *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

We must first determine and describe the legal standard to be applied. When one speaks of material facts, one means, of course, facts material to deciding the case under the relevant legal standard.

Here, the governing provision of the Voting Rights Act, Section 2, 42 U.S.C. § 1973, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The theory of the complaint is that the existence of a multimember district, as opposed to three single-member districts, reduces the opportunity of the plaintiffs, and those whom they represent, to participate in elections and to elect representatives of their choice. This is not a case in which the plaintiffs, if they prevail, would constitute a majority, either of total population or of voting-age population, in any of the new single-member districts. We thus at once put to one side cases like *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Smith v. Clinton,* 687 F.Supp. 1361 (E.D.Ark.), *aff'd mem.,* 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988); and *Jeffers v. Clinton,*

730 F.Supp. 196 (E.D.Ark.1989), *aff'd mem.*, —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). Instead, plaintiffs proceed on the theory that they are entitled to the creation of a so-called "influence" district, that is, one of the three single-member districts which they ask us to create, though not containing a majority of black or other minority voters, would contain enough of these voters to "influence" the choice of a representative. The Supreme Court has twice left open the question whether this "influence" theory is viable under Section 2 of the Voting Rights Act. *Thornburg v. Gingles*, 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12; *Chisom v. Roemer*, —— U.S. ——, 111 S.Ct. 2354, 2365 n. 24, 115 L.Ed.2d 348 (1991).

Most of the legal argument in the motion papers before us focuses on the question whether there can be such a thing as an influence claim under Section 2. Plaintiffs say that there can be, and defendants say there cannot. There is authority pointing both ways. See, *e.g.*, *Armour v. Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991) (three-judge court) (allowing an influence claim); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991) (same); *McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989) (rejecting an influence claim); *Brewer v. Ham*, 876 F.2d 448 (5th Cir.1989) (same). For purposes of this case, we assume that the influence theory is legally viable, and concentrate our analysis on the question whether the facts of this case make out a cognizable claim under that theory.

■ Plaintiffs' papers do not clearly state what they mean by "influence." At the oral argument, however, we had a chance to discuss the issues fully with counsel, and we think plaintiffs' claim can be fairly characterized as follows. The law does not require that multimember districts be invalidated whenever minority voters, by being bunched or packed together in a single-member district, would be more numerous than they are in the multimember district. In other words, to take an extreme example, if a three-member district contained a minority population of one per cent., but a single-member district could be drawn containing a minority population of three per cent., there would not be a violation of law simply because the "influence" of minority voters could, in some sense, be tripled. The Voting Rights Act does not require, invariably and in every instance, that districts be drawn so as to maximize minority political power. Such a result would be akin to a requirement of proportional representation, which the Voting Rights Act itself rejects. *Cf. Thornburg v. Gingles*, 478 U.S. at 94, 106 S.Ct. at 2789 (O'Connor, J., concurring) ("There is substantial doubt that Congress intended 'undiluted minority voting strength' to mean 'maximum feasible minority voting strength.'") So much plaintiffs seem to acknowledge. But in this particular case, they say, the voters they represent amount to only about nine per cent. of the population of the existing three-member district, while there would be about twenty-nine per cent. in one of the three single-member districts they are asking for. This circumstance, they say, is sufficient to make out an influence claim, entitling them to a trial at which they could put on their proof.

At this point it is appropriate for us to summarize the facts that are now before us that are relevant to such a theory. Essentially, the only facts we have are those allegations of the complaint that defendants have admitted. Mere pleadings are not to be considered on summary judgment, Fed.R.Civ.P. 56(e), and, as we noted at the outset, plaintiffs' opposition to the motion consists entirely of legal argumentation. It includes no affidavits, exhibits, discovery, or requests for judicial notice. The allegations of the complaint, to the extent that defendants have admitted them, may of course be taken as true in the present context, but they don't take the plaintiffs very far along the road they need to travel. Beyond the fact that there is a three-member district now, that it could be divided into three compact and contiguous single-member districts, and that one of these single-member districts could contain

twenty-nine per cent. total minority population, we have little or nothing. (And we are assuming, for purposes of this case, that plaintiffs' aggregation of African–American, Asian, and Hispanic voters is appropriate. Whether these voters in fact have such a community of interest that they should be lumped together for Voting Rights Act purposes is questionable, but we do not pursue that avenue of analysis.)

So what is left? If the Act does not always require the maximization of minority voting power, how do we distinguish those cases in which an "influence" district should be created, from those in which it should not? Plaintiffs have suggested no legal standards to differentiate these two kinds of cases. We can think of some, but there are no facts in the record that relate to them. If, for example, plaintiffs could show that the twenty-nine per cent. who are minority voters could join with enough non-minority voters to form a majority that would elect someone different to the legislature, that is, someone different from the person who would be elected under the present régime, plaintiffs might have a viable theory of attack. This could perhaps be shown by expert testimony, comparing the putative twenty-nine per cent. district in Sebastian County with some district in another part of the State with a comparable minority percentage. Or, even if this much could not be shown, it might be argued that the elected representative, even though not a different person, would vote differently in the Legislature if his or her district contained twenty-nine per cent. minority voters, as opposed to eight or nine per cent. Such a proposition is possible,

perhaps even intuitively likely, but it is not so certain that we could take judicial notice of it, and the present record is devoid of proof on the point. In short, to put it in practical terms, there is no concrete proof that minority voters would be better off with their own single-member district.[2] They are not numerous enough to elect a representative without help, and there is no proof that they would have enough help to elect a different representative, nor even that the same representative would behave differently in some relevant way.

We assume, then, that there is such a thing as an influence claim under Section 2, and that the relevant minority figure that could be aggregated by the creation of single-member districts is twenty-nine per cent., rather than eighteen per cent., the percentage of African–Americans considered by themselves. Even after making these assumptions, plaintiffs' claim cannot survive the motion for summary judgment. It founders not on any legal obstacle, but simply on the absence of relevant facts. If the present case did go to trial, and the proof were no different from the facts that are now before us, the defendants would be entitled to judgment as a matter of law at the close of plaintiffs' proof. There is no point to a trial, therefore, and the motion for summary judgment must be granted.

It is so ordered.

---

**2.** The plaintiffs' lack of proof here distinguishes this case from *Armour v. Ohio, supra*, upon which they rely heavily.

In *Armour*, the plaintiffs claimed that the drawing of two Ohio House of Representative districts split the black community and therefore diluted blacks' voting strength in violation of Section 2. The plaintiffs in *Armour* presented expert testimony indicating that eighty to ninety per cent. of blacks will vote for a Democratic Party candidate in a general election, while almost fifty per cent. of white voters will vote for a Democratic Party candidate. In addition, the plaintiffs presented evidence that representatives in the districts as currently drawn

were not responsive to the needs of black voters.

From the totality of this evidence, the court concluded that the plaintiffs had proved that blacks in a redrawn non-majority minority district could elect a candidate of their choice—although not necessarily of their race. In a redrawn district, which would not include the area's wealthy suburbs, blacks would comprise thirty per cent. of the voting age population and one-half of the Democratic vote. Such a configuration would require "the Democratic Party and its candidates ... to be sensitive to the minority population by virtue of that population's size." 775 F.Supp. at 1060.