Willie J. ROLLINS, and Ervin O. Grice, Plaintiffs–Appellants,

and

League of United Latin American Citizens # 188, Movant–Appellant,

v.

FORT BEND INDEPENDENT SCHOOL DISTRICT, et al., Defendants–Appellees.

No. 94–20570.

United States Court of Appeals, Fifth Circuit.

July 19, 1996.

Jose Garza, San Antonio, TX, for Appellants.

David Frishman, Katy, TX, Bernard E. Brooks, Stafford, TX, for Appellees.

Before KING, DeMOSS and STEWART, Circuit Judges.

STEWART, Circuit Judge:

In this voting rights case, Willie J. Rollins and Ervin O. Grice, plaintiffs-appellants, appeal the district court's judgment that they failed to prove that the at-large voting system used in the Fort Bend Independent School District dilutes the voting strength of black voters under section 2 of the Voting Rights Act and under the Fourteenth Amendment to the Constitution. They also appeal the district court's denial of their motion to supplement the record with evidence of the May 1994 election occurring after trial but before the district court rendered its judgment. For the following reasons, we affirm the district court's judgment.

## FACTS

The plaintiffs, two black residents and registered voters who live in the Fort Bend Independent School District (hereinafter "FBISD"), filed suit in November, 1992 alleging that the at-large voting system dilutes the voting strength of black voters under section 2 of the Voting Rights Act and under the Fourteenth Amendment to the Constitution. Plaintiff Willie J. Rollins unsuccessfully ran for election to the FBISD in 1987. Although Ervin O. Grice, the other plaintiff, has never sought election to the school board, he assisted on a few school board election campaigns.

FBISD has a seven-member board of trustees elected on an at-large basis for a three-year staggered term, which results in yearly elections of either two or three trustees. FBISD uses a plurality system rather than a majority system; thus, a candidate

wins if he has the most votes even if his total falls below fifty percent. The system allows each qualified voter to cast one vote for each position, and no slating process is employed. The plaintiffs claim that the at-large plurality election system was instituted to deny blacks and Hispanics the right to participate equally in the political process.

During the four day bench trial, the plaintiffs presented statistics to establish that the present system violates their constitutional rights and to show that their proposed plan would better serve FBISD. The plaintiffs sought the creation of seven single-member districts, including three "safe" districts.[1] The safe districts in the plaintiffs' single-member district plan are comprised of three minority districts: two black majority districts and a combination black/Hispanic district.

The population in the FBISD has grown dramatically since 1960. The population has increased from roughly 1,500 people to about 151,601 people. Consequently, school enrollment has increased 400 percent since the late 1970s.[2] Similarly, the black population in the FBISD more than doubled between 1980 and 1990. Blacks comprise approximately 25.3 percent of the total FBISD population and about 24 percent of the voting age population.[3] The plaintiffs' statistical evidence showed that most of the black population is concentrated around the Houston area, while the white populations are concentrated in the cities of Sugarland and Missouri City. Additionally, the statistics showed that overall the black population in the FBISD area is highly concentrated. Three voting precincts were comprised of minority populations exceeding ninety percent during the 1993 election.

Historical discrimination in FBISD is undisputed. Until 1953, an organization called the Jaybirds prevented blacks from voting and participating in politics in FBISD. Fur-

---

1. A "safe" district is one which has a sixty-five percent minority makeup.

2. A 1992–93 survey indicated that of the 40,761 students enrolled in the FBISD system, the majority are non-white. The statistics are as follows: black—11,538, white—11,538, Asian—4,574, Hispanic—5,877, and Native American—21.

3. The white and Hispanic percentages for the total population and voting age population were also similar. Respectively, the percentages were 52.5 percent and 54.7 percent for white and 13.8 percent and 13.2 percent for Hispanics.

ther, the schools were segregated until the 1960s. However, the parties dispute whether some vestiges of discrimination continue to exist in FBISD. The plaintiffs presented testimony suggesting that some vestiges of discrimination still exist in FBISD. For example, although the last formally segregated black school closed in 1969, the schools in the FBISD still are not fully integrated. The plaintiffs also presented statistics from the United States census showing that blacks and Hispanics disproportionately are high school drop outs and victims of unemployment. Further, blacks and Hispanics represent fewer people in FBISD with college, graduate school, or professional degrees. FBISD's evidence presented a more optimistic picture for blacks and Hispanics. Moreover, FBISD asserts that this Court's declaration in *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 594 F.2d 73 (5th Cir.1979), *after remand*, 651 F.2d 1133 (5th Cir.1981), that FBISD is "unitary" means that FBISD no longer harbors historical vestiges of discrimination, no policies are in place to perpetuate vestiges of discrimination, and that there is no need for federal intervention or remediation. Plaintiffs offered only limited anecdotal evidence based on their own personal experiences to show the continual presence of vestiges of racial discrimination in the FBISD despite its unitary status regarding the employment of minority members and professional staff. Moreover, the plaintiffs offered no evidence to challenge FBISD's evidence that the Board had been responsive to the particular needs of minority students.

Although eighty-six school board trustee positions have been opened and filled since 1960, and although blacks have run in nineteen of these elections, only two blacks have been elected. David Collins, was elected in 1986 during his fourth election attempt to win a seat on the board. Janelle Cherry was elected in 1991. The plaintiffs' expert explained that Cherry won because two strong non-black candidates split the votes in the four-candidate race and allowed Cherry to get the plurality. Although Collins was re-elected for a second term, in 1992 he was defeated by a first-time white candidate. However, Collins ran for another trustee seat in 1993 and won. There have been only four black victories within the present election scheme since 1966. No black has won in a head-to-head election or won when an election involved fewer than four candidates. The only Hispanic to ever serve as a trustee was elected in a contested election in 1966.[4]

The plaintiffs' expert's analysis involved the following: (1) evaluating precinct by precinct data, (2) looking at extreme case analysis,[5] (3) restructuring each election from 1986 through 1993 using a demonstration single-member district plan rather than the at-large system, and (4) using ecological, statistic regression analysis.[6] First, the plaintiffs' expert testified that no black candidate had ever received a majority of the votes in a precinct with more than seventy percent white population. Second, the expert found that in white-majority precincts blacks generally received only ten to twenty percent of the vote while in precincts heavily populated with blacks, they received seventy to ninety percent of the votes. Third, the election

4. We mention the 1966 victory only in passing. Because demographic data is not available before 1986, it is impossible to determine the proportion of minorities in the FBISD prior to 1986 and impossible to calculate the polarization demonstrated in pre–1986 elections. Additionally, because of the undisputed rapid population growth in the district, pre–1986 election data has little bearing on recent elections. Further, FBISD used a different election system until 1972, and FBISD changed its precinct numbering system after 1986.

5. In an extreme case analysis, polling places containing predominantly white populations are combined and then compared with the combination of precincts heavily populated with blacks.

6. Statistical regression analysis is a mathematical technique which looks at the relationship between two variables. In the present voting rights case, the experts analyzed the relationship between racial composition per voting box or precinct and the percent of votes for a specific candidate. Both the Supreme Court and Fifth Circuit have sanctioned the use of regression analysis to prove voting rights violations. *See Thornburg v. Gingles*, 478 U.S. 30, 52–53, 106 S.Ct. 2752, 2761, 92 L.Ed.2d 25 (1986); and *Houston v. Lafayette County*, 56 F.3d 606, 612 (5th Cir.1995).

reconstruction showed that the black candidates consistently won one, sometimes both, of the districts containing greater than fifty percent black voting age population. Also, unless an Hispanic was running, the black candidate also carried the combined black/Hispanic district. Finally, the statistical regression supported the testimony that black candidates received more votes in majority black voting areas.

Determined to shatter the statistical picture of voting rights violations presented by the plaintiffs, FBISD sought (1) to expose significant flaws in the plaintiffs' experts' analyses and statistical methodologies, and (2) to present to the district court plausible non-discriminatory explanations for the paucity of African American trustees in the FBISD.

Because the district court did not render a decision before the May 1994 elections, the plaintiffs sought to supplement the record with evidence from the May elections, namely that the black incumbent, Cherry, did not run for re-election and that the two black candidates seeking to replace her did not win. The court denied the request to supplement and entered judgment for the defendants because the plaintiffs failed to prove their case. The plaintiffs appealed,[7] arguing that minimal black success, occurring under special circumstances, does not demonstrate that blacks can consistently elect candidates of their choice. Additionally, the plaintiffs challenge the district court's findings and conclusions.

## DISCUSSION

## I. STANDARD OF REVIEW.

We review de novo the district court's interpretations of law. However, the district court's findings of facts regarding vote dilution are subject to the clearly erroneous standard. *Thornburg v. Gingles,* 478 U.S. 30, 78–79, 106 S.Ct. 2752, 2780–81, 92

L.Ed.2d 25 (1986) (noting that Supreme Court precedent demonstrates that the Court has "treated the ultimate finding of vote dilution as a question of fact subject to the clearly-erroneous standard of Rule 52(a)" and then reaffirming that this is the appropriate standard the Court explained: "application of the clearly erroneous standard to the ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law"); *see also, Overton v. City of Austin,* 871 F.2d 529, 533 (5th Cir.1989); and *LULAC v. Clements,* 999 F.2d 831 (5th Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

## II. STANDARD TO DETERMINE THE EXISTENCE OF LEGALLY SIGNIFICANT WHITE BLOC VOTING.

The plaintiffs argue that the district court applied the wrong legal standard when evaluating the existence of a significant white voting bloc. Instead of viewing the few black victories as an explainable exception to the general rule of white bloc voting domination, the district court erred in deeming these black successes as convincing proof that white bloc voting had only a negligible effect, if any, on the candidacy of African Americans. The plaintiffs maintain that the four black victories can be explained by "special circumstances." In one election, an incumbent ran unopposed. Further, in the other three elections the black candidate ran against three or more candidates where the multiple non-black candidates split the vote of the white voting community.[8] The plaintiffs contend that the district court effectively changed the test under *Gingles* III *from the white community's cohesive voting practices usually defeat the minority candidate to the white community's cohesive voting practices*

---

7. League of United Latin American Citizens # 188 (LULAC), was also a plaintiff below; however, it did not appeal independently. LULAC apparently has abandoned the action.

8. We observe that the plaintiffs frame their argument slightly different on appeal than they did at the trial court level. The plaintiffs' witness testi-

fied that all but one minority victory resulted from a split by strong white candidates who split the vote of the white voting community. However, on appeal the plaintiffs carefully assert that non-black candidates split the vote of the white voting community.

*always defeat the minority candidate.*[9]

By contrast, FBISD contends that the district court asked the plaintiffs for the appropriate legal standard, and the plaintiffs declined to provide the court with this information. When the district court asked the plaintiffs' voting rights expert, Attorney George Korbel, for the standard, Korbel provided only evasive answers suggesting only that the "I know it when I see it" standard (as used in pornography cases) was appropriate.[10]

Further, FBISD argues that federal courts use "the Senate Committee Factors," or the "*Zimmer* Factors"[11] when evaluating whether the totality of the circumstances establish a violation under section 2 of the Voting Rights Act. FBISD asserts that the district court in this case applied the correct legal standard; the plaintiffs simply failed to present sufficient, unimpeached evidence which could demonstrate under the totality of the circumstances that the FBISD at-large election system resulted in unequal access to the political process.

The plaintiffs' arguments regarding the special circumstances stem directly from Supreme Court language in *Thornburg v. Gingles*, 478 U.S. 30, 57, 106 S.Ct. 2752, 2770, 92 L.Ed.2d 25 (1986). The *Gingles* Court established the three requirements that the plaintiffs must satisfy to present a section 2 claim: (1) *Gingles* I: that the black voters are sufficiently numerous and populous to constitute a majority of the voting age population in at least one single district; (2) *Gingles* II: that the black community tends to vote in a cohesive manner to support black candidates; and (3) *Gingles* III: that in contested elections involving white and black candidates, the white community votes cohesively and that as a result the candidates supported by the minority community are usually defeated. *See Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67.

In clarifying the analysis of the third *Gingles* requirement the Supreme Court articu-

---

**9.** George Korbel, the plaintiffs' voting rights expert, testified that he had been involved with several Texas cases in which courts invalidated at large systems despite the existence of some minority successes. For example, in *Graves v. Barnes*, 446 F.Supp. 560 (W.D.Tex.1977), *aff'd*, 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978), five Hispanics had been elected to the state legislature through the at large system. In Houston, one black had been elected in the at large system. In San Antonio, 14 Hispanics had been elected to the city council under an at large system.

**10.** The district court asked Korbel whether there is a point at which an expert can say that there are enough whites voting for minorities so as to preclude a finding of polarized voting. After obtaining several evasive answers, Korbel attempted to answer by discussing Collins' 1992 election. The district court's questioning proceeded as follows:

Q So what you're telling me, if I understand you correctly, Mr. Korbel, is that if we just look—and I know there is a hazard of looking just at one election, but if we look at the 1992 head to head Collins/Wooten race, which you told me is among the most significant to your findings because it's the head to head races that are your test in essence your litmus test almost?
A It's the worse case scenario.
Q Right. Or it's the case that proves your point?
A Yes.

Q In order for this race to have precluded a finding of legally significant racially polarized voting, Mr. Collins would have had to win?
A No, Your Honor, I don't think that's correct.
Q How many more White votes would Mr. Collins have had to get in order for us to say he could still lose and there not be a legally significant racially polarized voting finding?
A Well, in the circumstance where you have a multi-term incumbent, I think he probably would have had to get an awful lot more votes.

Q And how many of those votes would have to be Collins' votes in order for us to say yes, he lost, but he lost because of who the candidates were rather than because of what their racial makeup was?
A I don't know that I'd quantify that, Judge. I don't know that even that ought to be the test. The test is—
Q I'm just trying to find out where the lines get drawn?
A I understand, Judge. I mean, I know it when I see it, but I'm not sure that I can reconstruct the election to show where it wouldn't be.
Q Okay. I can just see what the Fifth Circuit would do with the finding that said I know it when I see it.
Mr. Rios: That's what the Supreme Court does in pornography cases, Your Honor.
The Court: They're allowed.

**11.** *Zimmer v. McKeithen*, 485 F.2d 1297 (Former 5th Cir.1973) (en banc).

lated the definition of polarized voting: If black voters are cohesive and consistently support black candidates, but those candidates are usually submerged when votes from white areas are counted, significant racially polarized voting exists. 478 U.S. at 56, 106 S.Ct. at 2769. The *Gingles* Court noted that the success of *a* minority candidate does not automatically disprove the existence of white bloc voting. The Court listed several alternate explanations or "special circumstances" that "*may* explain minority electoral success in a polarized contest:" (1) the absence of an opponent, (2) incumbency, or (3) utilization of bullet voting. *See id.* (emphasis added). The plaintiffs maintain that because alternative explanations account for the Collins and Cherry victories, those isolated victories do not discredit the polarized white bloc voting in FBISD.

■ We must review de novo the district court's interpretation of the standard under *Gingles.* The district court was required to specifically discuss the special circumstances because the plaintiffs' evidence raised the issue of whether special circumstances explained the four victories. Heretofore, the Fifth Circuit has treated the special circumstances inquiry as an essential part of the *Gingles* III requirement. The Court consistently lists the requirement as follows: "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority preferred candidate." *See, e.g., Houston v. Lafayette County,* 56 F.3d 606, 609 (5th Cir. 1995); *Clark v. Calhoun County,* 21 F.3d 92, 94 (5th Cir.1994); *Magnolia Bar Ass'n v.*

*Lee,* 994 F.2d 1143, 1146 (5th Cir.1993), *cert. denied,* 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); *see also Rangel v. Morales,* 8 F.3d 242, 245 (5th Cir.1993); *Monroe v. City of Woodville,* 881 F.2d 1327, 1329 (5th Cir.1989), *cert. denied,* 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990); *Overton v. Austin,* 871 F.2d 529, 532 (5th Cir.1989); and *Campos v. City of Baytown,* 840 F.2d 1240, 1243 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). The issue is, therefore, whether the district court properly considered and analyzed the applicable special circumstances in the present case.

We find that the district court expressly discussed the special circumstances when addressing the black victories. The district court indicated that the evidence did not support the plaintiffs' claims regarding the special circumstances. The district court explained:

> Plaintiffs claim that white bloc voting defeats the preferred candidate of the minority community unless there are "special circumstances" present. Plaintiffs define such circumstances as a multi-candidate race in which two or more strong Anglo candidates split the white vote and thereby enable the minority candidate to succeed. The analysis of the races, using statistics and other factors, does not bear out this claim.... The evidence demonstrates that minority candidates have been elected to the FBISD school board without special circumstances, such as a candidate running unopposed or opposed by two strong Anglo candidates.[12]

**12.** The district court made express findings that it was not persuaded by the plaintiffs' experts and identified the facts that contradicted the plaintiffs' conclusions. The court's memorandum opinion explains as follows:

> The court finds that this conclusion is not supported by the election results presented and does not explain either minority success or failure in the FBISD elections. Black candidates have won elections in which there was only one strong white candidate. (Collins won the 1986 race in which one white candidate, Copsy, received 90 percent of the Anglo vote.) Black candidates have lost elections in which there were multiple strong non-black candidates. (Rollins lost in the 1987 race in which two white candidates, Ellis and Howell, split

the majority of the vote between them). Undercutting the validity of Korbel's conclusions are the following points:

* Less than 15 percent of the contested races are head-to-head black versus white contests. Eighty percent of all the races since 1980 have been multi-candidate races decided by a plurality.

* There have been two instances in which incumbent school board members have lost reelection bids. Both occurred in 1992; one candidate was black (Collins) and one was white (Cordes). The success of incumbents explains the election outcomes with greater consistency than any other single factor. The anti-incumbency mood in 1992 explains Collins's defeat in 199[2], not racially based voting.

The plaintiffs expressly raised issues regarding victories caused by incumbency and by white candidates splitting the white vote. The district court impliedly acknowledged the applicability of the "running unopposed" special circumstance to Collins' 1989 reelection. Additionally, the district court concluded that Cherry's victory in 1991 was the only one that resulted from white candidates splitting the vote. The district court rejected the plaintiffs' argument that Collins' 1986 and 1993 victories resulted from a split by white candidates. The plaintiffs offered no other theory or special circumstance to explain Collins' 1986 and 1993 victories.

Interestingly enough, in 1986, Collins ran against two white candidates receiving 89 and 1,161 votes, an Hispanic candidate receiving 200 votes, and a black candidate receiving no documented votes. The results do not reflect a voting split by the white candidates or any candidates for that matter. Dr. Alford testified that the election does not reflect a white split because one white candidate received in excess of ninety percent of the white votes. Dr. Alford further noted that "[Collins was] elected in spite of the fact that the splitting here is a split among minority candidates." The district court explained that because the Hispanic and black candidates opposing Collins were weak, Collins effectively defeated a white candidate in a head-to-head race. We agree. Collins appears to have won the election despite the absence of a white split.

Similarly, in 1993 when a trustee seat became vacant after his 1992 election defeat, Collins ran against one white candidate receiving 3,334 votes, and two Hispanic candidates receiving 4,867 and 651 votes respectively. Dr. Alford testified that there could not be a splitting by white candidates because only one white candidate ran. He explained that "[i]f the Anglos wanted to vote cohesively for an Anglo, there [was] an Anglo there for them."

Though an Hispanic and a white candidate split the votes in the 1993 election, the plaintiffs cite no authority to show that the mere presence of multiple candidates in an election qualifies as a special circumstance as described by the Supreme Court in *Gingles*. There is nothing special about an election in which a minority candidate splits the vote with either a white candidate or a minority candidate which allows another minority candidate to be elected. In this particular case, the minority victory which resulted from a voting split caused by another minority candidate cannot be attributed to a special circumstance. Dr. Alford testified that Collins would have won the 1993 election even if none of the minority boxes had voted. Plaintiffs did not persuasively rebut FBISD's evidence concerning the 1993 election. Accordingly, the district court simply did not believe that any special circumstances could explain away the other two victories Collins achieved. On this record, we cannot say that the district court erred.

Moreover, the district court's analysis appears consistent with the handling of the special circumstances in *Gingles*. The *Gingles* Court's comment regarding circumstances that *may* explain a single minority candidate's victory cannot be transformed into a legal standard which requires the court to force each and every victory of several minority candidates to fit within a prescribed special circumstance. Every victory cannot be explained away as a fortuitous event. The Supreme Court's mandate to the district court is to analyze the district's voting practice by evaluating the three *Gingles* factors and then by looking at the totality of the circumstances. This directive did not compel the district court in the present case to automatically pigeonhole the four minority victories into the prescribed special circumstances. If the victories could be explained

---

First-time candidates, black, white, and Hispanic, tend not to win the FBISD elections. This helps explain the election outcomes involving first time candidates who happened to be black, including Beard's 1993 loss; Rollins' 1990 loss; and Collins [sic] 1986 loss.

The court does not find Korbel's conclusions that the outcomes of the FBISD elections are determined by the race of the candidates to be persuasive. Dr. Alford, defendants' expert, acknowledged that there is a racial pattern to the voting, but it is not a pattern of white bloc voting in opposition to minority candidates. Dr. Alford supported his opinion by examining the individual races, as outlined above.

with the special circumstances, the district court was free to do so; however, because the special circumstances did not fit, the district court was not required to force it. We hold that based on the treatment of special circumstances in *Gingles,* the district court did not misapply the legal standard simply because it did not find special circumstances where none existed. After thoroughly reviewing the record, we cannot say that this finding was clearly erroneous.[13]

### III. VOTING DILUTION CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT.

The plaintiffs alternatively argue that if we find that the correct legal standard was employed, the district court's factual findings were clearly erroneous. They contend that the district court inappropriately discounted undisputed evidence that racially polarized voting occurs in the FBISD area. The plaintiffs also argue that the district court reached erroneous conclusions because it incorrectly interpreted the evidence.

### A. Evaluation of the district court's findings.

The plaintiffs criticize the district court's evaluation of their election statistics. By contrast, FBISD maintains that it impeached and made questionable most of the plaintiffs' substantive evidence. After thoroughly reviewing the testimony and evidence, we agree with FBISD.

 Though we agree that the district court probably discredited much of the evidence presented by the plaintiffs in this particular case, we must acknowledge the sensitivity of the issues involved. We do find it curious that only three minorities in the last twenty years have successfully been elected to the board of trustees for the FBISD. The parties cannot and do not dispute that FBISD's history is blemished by past racial discrimination. In addition to being cognizant of FBISD's past, we are well aware of the difficulty minority candidates generally face when seeking elections in at-large systems. *See Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1204 (5th Cir.1989), *after remand,* 906 F.2d 1042 (5th Cir.1990) (noting that it is well recognized that at-large voting schemes may operate to dilute minorities' voting strength). Nevertheless, we cannot ignore that the record before us is replete with examples of contradicted testimony, inadequate evidence, errors, and concessions that permitted the district court to discount the plaintiffs' evidence and, consequently, their legal theories.

FBISD severely impeached the testimony of the plaintiffs and their experts. For example, FBISD exposed numerous contradictions between Rollins' and Grice's testimony at trial and their deposition testimony. Likewise, it revealed errors in Korbel's exhibits[14] as well as a questionable methodology employed by Korbel when researching vestiges of discrimination.[15] Further, FBISD demonstrated inconsistencies in Dr. Flores' data[16] and showed that some of Dr. Flores' methodologies made his results inaccurate or unreli-

---

**13.** The plaintiffs contend that the district court's discussion of the *Zimmer* factors was affected by the misapplied legal standard. Our conclusion that the district court applied the correct legal standard and reached appropriate findings obviates the need to address the plaintiffs' argument that the district court failed to discuss several of the *Zimmer* factors.

**14.** Korbel testified that plan C of plaintiffs' exhibit 6 mistakenly showed a top to bottom deviation of three percent instead of ten percent.

**15.** Korbel testified that although he analyzed exogenous elections statewide he failed to evaluate endogenous elections in the FBISD area. Further, Korbel testified that he gathered information to analyze the *Zimmer* factors by interviewing several people living in the FBISD area. However, the pool of interviewees was derived from people he haphazardly met in coffee shops

and in an office in which he had an appointment with a businessman. Korbel failed to ask the interviewees several questions that probably affected his data base: how long the interviewees had lived in FBISD, whether they had children who were attending or had attended FBISD schools, whether they had attended FBISD schools, or whether they had relatives who were attending or had attended FBISD schools.

**16.** Dr. Flores admitted that he treated Collins' 1993 election differently than the other elections. Unlike the other elections, Dr. Flores did not combine all of the minority candidates for that election; Collins was separated from the other minorities. Consequently, Dr. Flores obtained a different y-intercept value for the 1993 election. Dr. Flores had previously testified that he had combined all of the minority candidates. When questioned, he conceded as follows: "Your Hon-

able.[17] Dr. Flores manually corrected exhibits while testifying and admitted to other errors FBISD and the district court identified.[18] Dr. Flores' testimony also indicated that his analysis was incomplete and slanted in support of the black plaintiffs.[19] Consequently, both Dr. Flores and Korbel were forced to concede that several of their opinions were either suspect or incorrect.

FBISD further impeached the plaintiffs' evidence by injecting into the case the issue of the minority candidates' viability. Based on the opinion of defendants' expert, Dr. John Alford, a serious candidate must raise and expend considerable sums of money for his campaign; the failure to do so renders the candidate non-serious and non-viable. Plaintiff Grice and Korbel were forced to concede that several minority candidates who lost were not "serious" candidates either because they spent little money or were not supported by the minority community.[20]

In addition to impeaching the plaintiffs' evidence, FBISD also presented evidence re-

---

or, I was mistaken on that one because—I am sorry."

Similarly, Dr. Flores did not consistently evaluate Hispanic candidates. He included an Hispanic candidate when analyzing the 1993 election but not when evaluating the other elections. FBISD asked why he varied his methodology. Dr. Flores responded: "It was just a mistake I made. There was no intent to mislead anybody."

**17.** FBISD showed that the plaintiffs failed to analyze issues peculiar to blacks and Hispanics. The plaintiffs did not evaluate several elections involving Hispanic and black successes. FBISD demonstrated that the plaintiffs had not analyzed head-to-head elections between Hispanics and white candidates, Hispanic defeats of blacks, successes by Hispanics and black, and races in which black candidates defeated other black candidates. Because Dr. Flores combined Hispanics and blacks to create minority statistics, FBISD's expert, Dr. John Alford, explained that it was impossible for the plaintiffs to do a regression analysis of just black voters and then to do a separate analysis of just Hispanic voters. Korbel also testified that it is impossible to determine cohesiveness if the data combines blacks and Hispanics.

Further, the plaintiffs' extreme case analyses of each precinct were unreliable because they did not involve precincts containing populations with a particular race comprising ninety percent of the precinct.

**18.** For example, the plaintiffs manually corrected Plaintiffs' Exhibit 28 because it failed to list Hispanics on the "Y axis," which reversed the variables. Dr. Flores also manually corrected Summary Table 2 on Exhibit 28 because the year 1990 appeared instead of 1988. Dr. Flores notified the court that the word "slope" should read "y-intercept" on Tables 3 and 4 on plaintiffs' Exhibit 29. Further, Dr. Flores failed to create a chart comparing the percentages of white voting age population for the 1992 election. When the district court asked why those percentages were not presented, Dr. Flores replied: "Maybe I over—I didn't—maybe it is an oversight on my part. I am sorry." Moreover, the district court's opinion indicates that Dr. Alford testified that Dr. Flores made a clerical error in his re-

gression analysis of the 1990 election and that the actual R value was .4847 and the actual y-intercept was 15.05. Because of the disputed figures, the district court did not rely on either set of numbers for the 1990 election.

**19.** On direct examination Dr. Flores testified without hesitation that blacks and Hispanics voted cohesively. On cross, when his conclusion was dissected, FBISD asked Dr. Flores whether he examined Hispanics' votes independently of black votes. Dr. Flores said yes but then hedged and effectively admitted that he had not adequately examined this issue:

> Q Now, did you examine the vote of the Hispanics independently of the vote of the blacks?
> A On occasion I did.
> Q Which occasions did you do that Dr. Flores?
> A I can't remember. I was doing it real rough form. But that is not what I was hired to do. I was just doing it out of curiosity sake.
>
> Q Is there any particular reason why you did not analyze any elections in which a Hispanic sought to be elected to the Fort Bend ISD board?
> A I was not asked to. That is not why I was retained.
> Q Well, they are one of the parties of the plaintiffs in this lawsuit, aren't they?
> A I was not asked to do that.
> Q But don't you have to do that though to determine cohesiveness?
> A No, all you have to do is combine the two. You don't have to look at them separately.

**20.** FBISD submitted financial reports of various minority candidates, which demonstrated that the only serious candidates were Collins and Cherry, who won. We are not persuaded that FBISD's explanation which defines a candidate's "seriousness" by the amount of money raised and spent on the campaign necessarily holds true in all cases. First, FBISD failed to offer financial reports of the white candidates who defeated the allegedly non-serious black candidates. Second, the emphasis on the money raised and spent

garding the white cross-over vote. The third prong of the test established in *Gingles* requires proof that the white community votes consistently as a bloc to defeat minority candidates. FBISD demonstrated that the minorities collectively received large percentages of the white vote. It argues that if the statistics proved that the white community actually voted for minorities on a regular basis, there could be no voting "bloc" in the white community systematically being used to defeat the preferred minority candidate.

The district court expressly found that the statistical results presented by the parties were very similar. The parties' experts depart primarily on the interpretations drawn from the results. The plaintiffs argue that the small number of minority victories, coupled with proof that minority candidates cannot carry white precincts, prove that minorities cannot effectively elect representatives of their choosing. FBISD argues that several minorities ran against each other in many of the elections, and in those cases the minority candidates collectively received over fifty percent of the votes in the white precincts. FBISD asserts that the ability of the minorities to obtain such a large percentage of the white vote disproves the existence of white bloc voting and demonstrates that minorities might be successful if they did not split the vote among each other.

We conclude that the parties presented two viable theories to explain the few minority successes in school board elections; however, we find that the district court chose to

believe FBISD's theory rather than the plaintiffs' theory because it discredited much of the plaintiffs' evidence. The district court expressly adopted FBISD's method of interpreting the statistics:

> Dr. Alford emphasized that in interpreting the regression results, the R and R$^2$ values, the slope, and the y-intercept point must all be examined. Applying this approach, the R values show significant polarization in the black community. However, the slope and y-intercept show that the white vote is much more randomly distributed with respect to race. Voters in predominantly Anglo precincts or boxes regularly give substantial votes to minority candidates, even in a head-to-head race. White voters do not vote consistently or cohesively for minority candidates—or for nonminority candidates.

> The court finds this analysis correct. This analysis alone recognizes the frequent presence of reasons other than a candidate's race to explain the defeat of that candidate. This analysis alone explains why some minority candidates in the FBISD have done well in both minority and Anglo boxes, and have won, and why other candidates have done less well in both minority and Anglo boxes, and have been defeated. This analysis alone explains the voting patterns in the FBISD.

The district court also revealed its dissatisfaction with the plaintiffs' evidence in numerous places in its opinion.[21]

---

ignores other serious campaign efforts that involve little or no money. Though funding and defeat at the polls are correlated, nothing in the record establishes that a causal connection between the two variables exists in the present case.

**21.** On the issue of black/Hispanic cohesive voting, the district court commented:

> This court finds that the testimony lacks a sufficient basis and that the regression analysis did not support African–American/Hispanic cohesion.... [T]he court finds that the conclusion as to Hispanic voters supporting black candidates is not supported by the record.... No concrete, reliable, or credible evidence was presented at trial that Hispanic and African–American communities work together to accomplish common goals in the FBISD.... The facts that [Rollins] relied upon [to prove

that African–Americans and Hispanics work together] contradict his own conclusions.

The district court also identified deficiencies in other areas, such as the vestiges of discrimination in the FBISD:

> Rollins offered nothing but speculation to justify [his] belief [that the Board disassociated from the community college which had a black-controlled board]. The court does not find this credible evidence that vestiges of official discrimination or intentional discrimination remain in the FBISD board.... Rollins testified that his knowledge [that private country clubs in FBISD had no minority members] was based on occasional visits to three clubs, during which he observed no blacks among the golfers. This limited, anecdotal evidence, even if true, is not credible proof that vestiges of discrimination remain that hinder the ability of minority groups to participate in the political process.... [Regarding the plaintiffs' belief

Because FBISD impeached or made questionable most of the plaintiffs' evidence, it is not surprising that the district court found FBISD's interpretation of the statistics more reliable. We believe that the district court's implicit credibility assessments necessarily affect the conclusions it reached regarding the many elections discussed at trial. With this in mind, we will discuss each of the plaintiffs' contentions.

■ First, the plaintiffs challenge the district court's inconsistent use of the term incumbency.[22] The court first discounted Collins' defeat in 1992 because of an alleged anti-incumbent sentiment generally affecting the citizens. Then, the district court seemingly contradicted this reasoning when it discounted the 1993 loss of black candidate Beard because he had low name recognition

and was defeated by an incumbent. Similarly, in explaining Plaintiff Rollins' 1987 defeat, the district court attributed the loss to his being a first-time candidate running against a long-time incumbent.

We cannot agree with the plaintiffs' arguments. The record supports the district court's conclusions regarding the use of the term incumbency as well as the court's treatment of FBISD's first-time candidates. The district court's conclusions must be measured against the deficiencies the district court identified in the plaintiffs' evidence. For example, as we discuss in much more detail later in this opinion, the district court expressly limited the probative value of the plaintiffs' statistics[23] and discounted evidence about several elections the plaintiffs presented.[24] After reviewing the record, we

---

that whites orchestrate opponents to strong black candidates not acceptable to the Anglo community,] Grice and Rollins both admitted that they had no facts to support this belief, and themselves characterized it as "hearsay" and "speculation." This court does not find this to be credible evidence of organized efforts in the white community to target black candidates for defeat. Neither Rollins nor Grice, nor any other witness, testified as to any overt or subtle racial appeals in the FBISD school board campaigns. No evidence was presented at trial that political campaigns within the FBISD have been characterized by either overt or subtle racial appeals.... Rollins' testimony [that the Board discriminated when it refused to allow Collins to serve as president though he had seniority on the Board] is ... speculation with no factual basis.... There was no evidence at trial that official barriers [to voting] continued to exist [after the Jaybird Party disbanded in 1953].... The record contains details of the programs that the FBISD has implemented to meet the particularized needs of minority students. Plaintiffs did not challenge the breadth and depths of the FBISD's efforts to respond to educational needs of minority students [despite their claims that the Board at times demonstrates insensitivity to minority concerns].... No evidence was presented at trial that establishes that institutional remnants of racial discrimination still exist within the FBISD.... No evidence was presented at trial that any entity or person within the FBISD intended to discriminate against any minorities in the FBISD Board of trustees elections.

22. The plaintiffs maintain that the anti-incumbent feeling penetrated the white population only. Further, the plaintiffs dispute the district court's explanation that black candidates were defeated because they were first-time candidates. Twenty first-time white candidates have won

since 1978, only one black, Cherry, won during that period. First-time Caucasian candidates ran against first-time black candidates ten times since 1978, and only one black won. Finally, a first-time white defeated black incumbent Collins in 1992.

23. The district court noted the following problems with the plaintiffs' statistical evidence:

No evidence of multi-variate regression analysis was presented to the court. The parties did not present the court with any statistical analysis that attempted to isolate the impact of race on election results as compared to other potential factors entering into a citizen's voting decision.... This court finds that the probative value of the regression analysis is limited by the failure to identify "serious" candidates.... No evidence was presented to this court as to the number of registered voters within the FBISD.

24. The district limited the weight given to the following elections:

Dr. Alford testified that Dr. Flores had made a clerical error in the regression analysis and that the actual R was .4847 and the actual y-intercept was 15.05. The R for all minorit[ies] voting for the minority candidates was .792 and the y-intercept was .071. Due to the disputed facts, the court declines to rely on either set of numbers.... No evidence was presented to the court regarding the number of exogenous elections held during the relevant time period, the demographic make-up of the constituencies, the percentage vote received by a candidate, and/or the success of the preferred minority candidates. No evidence was presented to the court as to why or how the exogenous elections are considered probative as to whether the white community of the

cannot say that the conclusions regarding incumbency and first time candidates are clearly erroneous.

■ Second, the plaintiffs dispute the district court's explanation that Plaintiff Rollins' defeat occurred because Rollins lacked minority support, not because of white bloc voting. The plaintiffs further argue that the district court failed to discuss the plaintiffs' undisputed evidence that Rollins would have won at least one, if not both, of the black districts under the plaintiffs' redistricting proposal. The district court reasoned that Rollins did not carry two major voting areas; he was defeated by a black in an election for County Commissioner, and was a first-time candidate for a school board trustee position.

We conclude that the record supports the district court's findings. Rollins conceded that he failed to carry the Hunters Glen precinct which was at least seventy percent minority when he sought election to the Board. He also admitted that another minority defeated him in the election for county commissioner. Sufficient evidence exists in the record to support the conclusion that Rollins was not the preferred candidate of the black community. Error has not been committed simply because the district court does not discuss the evidence in terms of the plaintiffs' theory (i.e., that Rollins would have won in a single district election scheme), when the district court deliberately and reasonably rejects that theory. Evaluating Rollins' election with the other elections and evidence considered by the district court, the conclusion regarding Rollins' election is not clearly erroneous.

■ Moreover, the Supreme Court has reaffirmed that the district court's findings regarding voting dilution should not be disturbed unless clearly erroneous because of the district court's "familiarity with the indigenous political reality." *Gingles,* 478 U.S. at 59, 106 S.Ct. at 2781. Here, the district court's particular familiarity with the politics in FBISD cannot be ignored. The opinion reflects that the district court considered and weighed the evidence presented by the parties. The district court exercised its prerogative to question the witnesses for both sides where necessary in order to be sure that it fully understood the evidence presented. After doing so, the district court reached the conclusion that the plaintiffs did not prove their claim of voting dilution. Specifically, there is evidence in the record to support the conclusion that the plaintiffs failed to prove the second and third prongs of the *Gingles* test. Therefore, we cannot say that any of these findings are clearly erroneous when considered under the totality of the circumstances.

B. Evaluation of the plaintiffs' statistical evidence.

The plaintiffs maintain that they presented a strong case of racially polarized voting. They introduced statistical analyses regarding every black candidate running between 1986 and 1993. Although the district court found that the statistical evidence was not helpful, the plaintiffs contend that their statistical evidence is consistent with the type of evidence found by this court to be adequate. Accordingly, the plaintiffs contend that the district court had to discuss its reasons for rejecting the plaintiffs' evidence.

■ Regarding the adequacy of evidence needed to prove voting dilution, this Court has noted that statistics alone are not sufficient to prove impermissible voting dilution. *See Parnell v. Rapides Parish Sch. Bd.,* 563 F.2d 180, 184 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). However, statistics, such as extreme case analysis, and ecological regressions have been approved by the Supreme Court and the Fifth Circuit to prove racially polarized voting patterns. *Gingles,* 478 U.S. at 52–53, 106 S.Ct. at 2761; and *Houston,* 56 F.3d at 612. The plaintiffs' evidence is among the types of evidence approved for voting dilution claims. While the type of evidence is satisfactory, it is the quality of the plaintiffs' evidence that the district court found to be satisfactory. Un-

FBISD sufficiently votes as a bloc in order to defeat the preferred minority candidate for the

FBISD board of trustees.

der the clearly erroneous standard of review, we cannot easily reverse the district court's factual findings regarding the lack of racially polarized voting in FBISD.

Though the plaintiffs presented facially persuasive statistics, the statistics were not presented by convincing witnesses. The record establishes that FBISD challenged the plaintiffs' evidence to a degree that rendered its potency questionable. Moreover, the district court had ample room to find the FBISD witnesses to be more credible than the plaintiffs' witnesses. The plaintiffs attempt to dismiss the errors of their experts as minor mistakes, typographical errors, and ambiguous questioning; however, we find that when assessing a witness's credibility regarding methodologies and statistics, numerous minor errors can make all of an expert's findings and theories unbelievable. Accordingly, the district court was well within its considerable discretion to conclude that the plaintiffs' evidence was unreliable and their theories unpersuasive.

 Nevertheless, we will address the other specific challenges regarding the plaintiffs' evidence. First, the plaintiffs contend that there is no authority requiring them to offer statistics that isolated the impact of race on election results as compared to other factors affecting voting. When discussing the absence of a legally significant voting bloc, the district court cites *Brewer v. Ham,* 876 F.2d 448, 454 (5th Cir.1989) to explain that the plaintiffs did not present multi-variate analysis considering other factors. As discussed above, the plaintiffs' own experts and the district court identified several shortcomings of the statistical analyses and the evidence on which the analyses were based. We find that although the plaintiffs were not *required* under existing case law to present a *multi-variate regression analysis comparing* the impact of other factors affecting voting, had they done so this evidence may have helped them to prove the existence of a significant bloc vote in the present case.

Second, the plaintiffs assert that the district court placed undue reliance on the plaintiffs' failure to prove the registration levels in the FBISD. It is true that this Court has indicated that voter registration data is not the sole criteria in the voting rights analysis. *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1162 (5th Cir. 1981). However, the plaintiffs misconstrue *Wyche* by taking the statement out of context. In *Wyche,* we actually recognized the importance of voter registration data: "[N]either the Supreme Court nor this court has ever held that voter registration is irrelevant: it is simply not the sole criterion.... *As we have noted, that is an important factor, perhaps the single most significant one in determining vote dilution."* *Wyche,* 635 F.2d at 1162 (emphasis added); *see also Rangel v. Morales,* 8 F.3d 242, 245 (5th Cir.1993) (citing *Gingles,* the court noted that the number of registered voters affects the inquiry regarding white bloc voting); *Westwego,* 906 F.2d at 1046 (acknowledging that minority voter registration data is relevant to evaluating the first *Gingles* factor); and *Overton v. City of Austin,* 871 F.2d 529, 539 (5th Cir.1989) (recognizing the limitations of statistical analysis where the expert's extrapolations ignored voter registration). The district court merely commented that the plaintiffs failed to present evidence regarding voter registration data. This comment, in view of the significance that this Court places on voter registration information, does not demonstrate that the district court placed undue reliance on the plaintiffs' failure to present registration data.

In reaching these conclusions, we cannot say unequivocally that the FBISD system does not in fact violate the Voting Rights Act. We hold only that the plaintiffs failed to establish a violation with the evidence they presented in this case.

## IV. SUFFICIENCY OF THE DISTRICT COURT'S DETAIL IN ITS FINDINGS.

The plaintiffs ask this Court to remand the case because the district court failed to make detailed findings of fact and conclusions of law as required by the Fifth Circuit. The plaintiffs contend that the district court had to make specific findings regarding all the factors considered by the court, especially where the factors are resolved against the plaintiffs.

First, the plaintiffs question the district court's failure to discuss their evidence regarding two races, in which black candidates were involved with head-to-head elections with white candidates, because the races show the improbability of a black being successful in a head-to-head race with a white. We find no merit to the plaintiffs' contention regarding the two head-to-head elections.

The district court presented a detailed discussion of Collins' 1992 and Beard's 1993 defeats. The discussions, however, reflect that the district court believed FBISD's theory. The district court explained that Collins was an incumbent running during a period of anti-incumbent sentiment sweeping at least the white community in FBISD. Further, the district court recounted Hal Jay's testimony that Collins "did not run a very good campaign in 1992 because Collins was overconfident about his reelection and did not take the challenge from Wooten seriously." Similarly, the district court detailed the raw scores and statistics regarding the 1993 head-to-head race between Beard (a black) and Block (a white). The court even mentioned that Beard received essentially the same raw votes as Collins in 1993 yet Collins won and Beard lost. Later, the district court mentioned that "[a]lthough Beard was running in a head-to-head race against a white candidate, the Hispanic community tended to vote for his Anglo opponent, Block." That the district court failed to discuss the head-to-head contests is not supported by the record. The district court simply did not discuss the races as the plaintiffs wished.

■ The plaintiffs also assert that the district court erroneously discounted the eight elections before 1986. The district court explained why it analyzed only the elections occurring after 1986. The district court found that "because of the dramatic changes in population size in the FBISD, the election results before 1986 are of such limited probative value that they need not be examined here." The record supports this conclusion and also presents additional reasons that cast doubt on the reliability of pre-1986 election data. Because demographic data is not available before 1986, it is impossible to determine the proportion of minori-

ties in the FBISD prior to 1986 and impossible to calculate the polarization demonstrated in pre-1986 elections. Additionally, FBISD used a different election system until 1972, and FBISD changed its precinct numbering system after 1986.

■ The plaintiffs also contend that the district court failed to discuss the plaintiffs' evidence when considering the totality of the circumstances. For example, the court dismissed the history of discrimination in Texas by saying that after the Jaybird party, which was organized to prevent blacks from voting and participating in local politics, was disbanded in 1953, there was no indication that barriers to voting continued to exist. We disagree with the plaintiffs' suggestion that the district court ignored the history of political problems in Texas.

We find that the district court adequately discussed the plaintiffs' evidence in light of the conclusions it reached. Under the circumstances, there was no need for further discussion of the history of discrimination in FBISD. First, the district court acknowledged that "[t]he historical evidence presented at trial established that blacks in the FBISD were subject to official discrimination in the past." Second, the district court expressly accepted the Fifth Circuit's conclusion in *Fort Bend Indep. Sch. Dist. v. City of Stafford, supra,* that FBISD had achieved "unitary status." Third, plaintiff Rollins admitted that the Jaybird party was disbanded in 1953 before the school district was formed in 1959. The district court mentioned the Jaybird organization and detailed the plaintiffs' evidence regarding socio-economic factors before concluding that official barriers to voting do not exist in FBISD and that socio-economic differences between minorities and whites do not prevent meaningful participation in the political process. We find that the district court satisfied its duty to discuss the evidence and the basis for its conclusions.

■ Further, the plaintiffs question the limitation the district court placed on the probative value of the plaintiffs' statistical data. The district court, citing *Campos,* 840 F.2d at 1245 n. 7, complained that the plaintiffs did not distinguish the serious candi-

dates from non-serious candidates. In *Campos*, this Court noted that "[i]f the minority candidate is not serious and gains little support from any segment of the community, it cannot be said that the minority community 'sponsored' the candidate and that election need not be examined." *Campos*, 840 F.2d at 1245 n. 7. The plaintiffs argue that because in every election the black candidate would have won under a single district voting scheme, the candidates were serious. However, the plaintiffs' expert, Korbel, explained that a candidate is not serious if he receives less than twenty-five percent of the vote in a precinct and then conceded that Montez, Garcia, Peterson, Woodard, and Clark were not serious candidates. The district court discussed the plaintiffs' statistical data in great detail before it explained its reservations regarding the evidence. Considering this Court's pronouncement in *Campos* along with the admissions of the plaintiffs' own expert, we cannot say that the district court was mistaken in the limitation it placed on the plaintiffs' statistics. Moreover, we cannot conclude that the district court inadequately discussed either the statistics or its limitation on the probative value.

■ Finally, the plaintiffs criticize the district court's consideration of the plaintiffs' evidence regarding statewide elections involving minority candidates only to the extent probative of whether the white community of FBISD votes as a bloc to defeat minority candidates. The plaintiffs contend that the evidence of statewide elections was relevant because of the consistent relationship between race and voting, which the plaintiffs' expert found. It is true that Dr. Flores testified to a very high correlation between race and voting in the exogenous elections. He specifically evaluated only FBISD precincts for the statewide and county wide elections he examined. However, when questioned by the district court, Korbel admitted that the exogenous elections that he examined did not accurately reflect the voting habits of FBISD[25] and that he had not examined endogenous elections within FBISD. Moreover, the district court specifically identified deficiencies in all of the exogenous elections, which reduced their probative value:

> All of the elections are partisan elections, with a candidate needing a majority to win. No evidence was presented to the court regarding the number of exogenous elections held during the relevant time period, the demographic make-up of constituencies, the percentage vote received by a candidate, and/or the success of the preferred minority candidates.

The plaintiffs failed to furnish enough data for the district court to adequately compare and evaluate the exogenous elections. We find that the district court provided sufficient reasons for limiting its use of the exogenous elections, and we cannot say that the district court erred in limiting the probative value of the exogenous elections.

■ Even assuming that the district court did not discuss and/or should have discussed evidence which the plaintiffs identify, we note that this Court does not require the district court to expressly mention all the evidence in its opinion. We have instructed the district court to thoroughly discuss the statistics offered by making specific references to the evidence. *Houston*, 56 F.3d at 612. Also, we have warned the district court not to make broad and general statements which are not specifically tied to the evidence. *Id.* Although the district court is not required to recount every bit of evidence adduced at trial, it must discuss all "substantive" evidence contrary to its opinion. *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir.1984). Further, this Court has remanded cases in order for the district court to "explain specifically which evidence it finds credible and which it does not, to provide reasons for its conclusions and then to evaluate the strength of that evidence[.]" *Westwego*, 872 F.2d at 1210 n. 12. We find that the district court provided very detailed discussions regarding the *Gingles* and *Zim-*

25. For example, in Texas elections outside of FBISD, there is a higher voter turnout in the Hispanic community. Further, Hispanics and blacks vote together. However, when analyzing the exogenous elections, Korbel assumed that the voting patterns in the exogenous elections occurred in FBISD. The statistics did not support this assumption.

*mer* factors, its findings, and conclusions. The plaintiffs arguments are without merit.

## V. SUPPLEMENTATION OF POST–TRIAL ELECTION DATA.

Although the plaintiffs concede that this is not a serious error of law, they argue that data from the May 1994 election is important because the two black candidates who sought to replace Cherry were defeated. Now, only one black, Collins, remains on the FBISD Independent School Board.

FBISD responds that the motion and supporting affidavit to supplement the record contained matters already before the court. FBISD also contends that the information was not dispositive and actually buttressed the FBISD position that non-serious candidates consistently lose in the FBISD elections. Finally, FBISD claims that the plaintiffs fail to assert how this error affects their case and fails to cite authority in support of the error.

■■■■ Rules 59(e) or 60(b) of the Federal Rules of Civil Procedure provides authority for the plaintiffs to seek supplementation. Accordingly, we must review the district court's denial of the motion for abuse of discretion. *Midland West Corp. v. FDIC,* 911 F.2d 1141, 1145 (5th Cir.1990). Although the plaintiffs did not allege the proper grounds and necessary proof required for reopening the record under rule 59(e) or rule 60(b), this Court has emphasized the relevance of elections occurring subsequent to trial and has even remanded cases to allow the plaintiffs an opportunity to supplement the record with evidence of subsequent elections. *See Westwego,* 906 F.2d at 1045. Nevertheless, neither supplementation nor remand is justified in the present case.

First, the results do not alter the evidence presented at trial. The results of the May 1994 election show that Liz McLean, a white candidate, defeated two black candidates. McLean received 2,696 votes, while the black candidates, Arthur L. Pace, Sr., and James Beard, received 1,511 and 1,474 respectively. Collectively, the minorities received 2,985 votes. The election results are consistent with the defendants' theory of the case. This is the reasoning which the district court apparently adopted; therefore, this evidence standing alone would not have changed the outcome of this case.

Second, the plaintiffs' proffer came from a witness whom the district court apparently discredited. The plaintiffs attached a copy of the summary regression analysis prepared by their testifying expert, Dr. Flores, to their response to the defendants' opposition. The precinct by precinct analysis indicated that Beard, who carried sixty-eight percent of the votes in majority-minority precincts, was the overwhelming choice in the black community. Flores concluded that Beard would have prevailed in a single district system. Because the district court probably discredited this expert due to inadequate testimony and flawed trial exhibits, the court probably would not have found this supplemental analysis persuasive.

Finally, remand probably would waste judicial resources because the election data would not alter the district court's decision. Although the district court did not reopen the record or conduct a hearing, the court's memorandum opinion clearly indicates that it evaluated the quality of the proffered evidence. The district court noted that "the evidence presented at trial was sufficient for th[e] court to determine whether the at-large method for the FBISD school board elections violated the Voting Rights Act or the United States Constitution." Additionally, the court commented that the plaintiffs failed to show that the proffered new evidence required reopening the record or changes in the factual or legal findings already made by the court. Based on these statements, we are convinced that the district court did, in fact, consider the May 1994 elections and concluded that the data did not change or impact the evidence presented at trial. Because the district court considered the evidence to some extent before rendering its decision, we cannot say that the district court's decision represents an abuse of discretion.

Moreover, because the result would not likely change, this case is distinguishable from *Westwego.* In that case, the expert presenting the supplemental analysis was previously found credible by the district

court. 906 F.2d at 1044. Also, the district court had noted in its first opinion that it was "significant" that no black had ever run for the alderman position at issue. The post-trial election involved a black who was defeated when running for this position. It was possible that because the subsequent election in *Westwego* involved the first alderman race with black candidate, the district court's decision might change. This is not the case here. The evidence from the May 1994 election is duplicative of the mountain of evidence adduced at trial. The race mirrored the many other races analyzed by the three experts. Remand is not necessary under these circumstances. Therefore, we hold that the district court did not abuse its discretion in denying the plaintiffs' request to supplement the record.

## VI. MOTION TO CONSIDER 1996 ELECTION RESULTS.

■ Pending this appeal, FBISD filed a motion asking us to consider the results of the school board elections occurring in May, 1996. It argues that the elections demonstrate the electability of black candidates because two blacks were elected. The plaintiffs oppose the motion because the defendants present the results absent any statistical analysis. The plaintiffs contend that remand would be appropriate in order for both the 1995 and 1996 election results to be considered. We disagree with both parties.

As framed, we cannot independently evaluate the May 1996 election results. FBISD asks us to consider the evidence; it does not request a remand of the case in order for the district court to evaluate the evidence. We have previously indicated that this Court may not consider election results that the district court did not have before it when making its decision. *See Zimmer, supra,* 485 F.2d at 1307 ("The significance attached to success at the polls in the instant case is unavailing ... First, these results were not before the district court when it rendered the opinion we are presently reviewing. It is axiomatic that an appellate court cannot take cognizance of matters not passed upon by the trial court.") (election occurred after trial but before entry of the district court's judgment);

and *Monroe,* 881 F.2d at 1329 n. 2 (after noting that two blacks were elected in an election subsequent to trial the court explained that "[t]he district court did not have the results of this election before it; accordingly, these results play no part in our review of the court's conclusions") (election occurred after entry of the district court's judgment). *See also Salas v. Southwest Texas Junior College District,* 964 F.2d 1542, 1544–45 n. 7 (5th Cir.1992) (although noting that the results of an election occurring after trial would alter the district court's factual findings, that court cited *Monroe* and commented as follows: "We simply note these facts; they do not affect 'our review of the [district] court's conclusions' ") (election occurred after entry of the district court's judgment).

Accordingly, we hold that it is not within our province to evaluate election results not contained within the record when the district court ruled. We further note that under the circumstances of this case, which has remained unresolved since its filing in November 1992, we are hesitant to prolong this case by remand when the significance of the offered evidence could only be determined after additional trial proceedings.

## CONCLUSION

It is undeniable that FBISD's past is scarred with racial discrimination. That so few blacks have been elected as trustees of the Fort Bend Independent School District over such a long time span does give us pause. Nonetheless, section 2 of the Voting Rights Act could only dissipate that pause where the plaintiffs present a record on appeal that convincingly shows their burden of proof was carried. Having failed to satisfy the trial court that the requisite elements of a Voting Rights Act violation were proven and having similarly failed to show us that the trial court clearly erred in either its factual findings or its legal conclusions, we are constrained to uphold the judgment below.

For the foregoing reasons, we find no merit to the plaintiffs' assignments of error regarding the legal standard employed by the district court, the district court's interpretation of the evidence before it, or the adequa-

cy of the detail in the district court's opinion. We also find that the district court did not abuse its discretion by refusing to consider evidence from the May 1994 election. Therefore, we AFFIRM the judgment of the district court holding that the plaintiffs failed to establish a violation of the Voting Rights Act. Additionally, we DENY FBISD's motion asking us to consider the May 1996 election results.